THE R. & J. FURNITURE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 30251.  Promulgated July 24, 1953.

*Ernest H. Cohen, Esq.,* and *John Wiseman, C. P. A.,* for the petitioner.

*James F. Kennedy, Jr., Esq.,* for the respondent.

862

OPINION.

Van Fossan, *Judge:* It is petitioner's position that, for excess profits tax purposes, it is entitled to compute its excess profits credit for the years involved under the income method provided in section 713, Internal Revenue Code,[1] using as its average base period net income the earnings of the partnership during the years 1936 to 1939, inclusive. For petitioner to prevail, the transaction by which it acquired its initial assets must be shown to have been such as to qualify petitioner as an "acquiring corporation" within the meaning of sec-

---

[1] SEC. 713. EXCESS PROFITS CREDIT—BASED ON INCOME.

(a) Amount of Excess Profits Credit.—The excess profits credit for any taxable year, computed under this section, shall be—

(1) Domestic Corporations.—In the case of a domestic corporation—

(A) 95 per centum of the average base period net income,

(B) Plus 8 per centum of the net capital additions as defined in subsection (g), or

(C) Minus 6 per centum of the net capital reduction as defined in subsection (g).

　*　　　*　　　*　　　*　　　*　　　*　　　*

tion 740 (a) (1) (D) of the Internal Revenue Code.[2]   So to qualify, two statutory prerequisites must be met.   First, petitioner must have acquired "substantially all" of the properties of the partnership. Second, the transfer wherein such acquisition was achieved must have constituted an exchange to which the provisions of section 112 (b) (5)[3] of the Code, "* * * or so much of section 112 (c) or (e) as refers to section 112 (b) (5), or to which a corresponding provision of a prior revenue law, is or was applicable."

The question posed as to whether petitioner acquired "substantially all" of the partnership's properties is essentially one of fact to be resolved as an ultimate conclusion based upon the peculiar facts and circumstances attending the transfer with which we are concerned. Cf. *Peabody Hotel Co.*, 7 T. C. 600.   The important factors to be considered in arriving at such conclusion include the nature of the properties retained by the partnership, the purpose for which they were so retained, and the amount thereof.   *Milton Smith*, 34 B. T. A. 702.   As we said in *Daily Telegram Co.*, 34 B. T. A. 101, at page 105:

> The term "substantially all" is a relative term, dependent on the facts of any given situation.   It is obvious that what might in one case, with a certain total of property involved, constitute substantially all of such property, might be but a small part of the total property involved in another case.   In the present case a reading of the instrument in question leaves one with the impression that petitioner undertook to transfer substantially all of its properties.   The evidence is that the agreement was substantially carried out and that thereafter petitioner had only "a few thousand dollars in real estate properties * * *."   This was the testimony of one of the two owners of petitioner, who was also a party to the agreement.   Giving this expression its normal meaning and considering the total amount of property involved, we have concluded and found as a fact that the new corporation acquired substantially all of the properties of petitioner. * * *

Although the foregoing involved the meaning of the term "substantially all" as used in a different statute, the same reasoning and prin-

---

[2] SEC. 740. DEFINITIONS.
   For the purposes of this Supplement—
   (a) ACQUIRING CORPORATION.—The term "acquiring corporation" means—
      (1) A corporation which has acquired—
      *         *         *         *         *         *         *
      (D) substantially all the properties of a partnership in an exchange to which section 112 (b) (5), or so much of section 112 (c) or (e) as refers to section 112 (b) (5), or to which a corresponding provision of a prior revenue law, is or was applicable.

[3] SEC. 112. RECOGNITION OF GAIN OR LOSS.
   (b) EXCHANGES SOLELY IN KIND.—
      *         *         *         *         *         *         *
      (5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation ; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. * * *

ciple there applied is applicable here. With such rationale in mind, we examine the record here made.

The petitioner was incorporated in 1940 to take over and continue the retail furniture business theretofore actively carried on by the partnership since the formation thereof in 1932. At the time of the exchange here in question, the gross assets of the partnership, exclusive of any value to be attributed to good will or certain accounts receivable theretofore written off, had a total book value of $394,149.98. Of this amount of assets, $334,692.21, or approximately 85 per cent thereof, was transferred to petitioner. The partnership's good will, as well as its previously charged-off accounts receivable in the face amount of $83,016.90, the respective values of which were not included in the amount of the foregoing assets, were also transferred to petitioner. Uncontradicted evidence establishes the value of such receivables at the time to have been approximately $50,613.10. As in *Daily Telegram Co.*, *supra*, so here, a reading of the instrument of transfer leaves us with the impression that the partnership undertook to transfer substantially all of its properties. In fact, there appears to be no question that the only asset of the partnership not so transferred to petitioner, was the fee in the real estate which was owned and occupied by the partnership and which, together with an elevator, had a book value of $59,457.27 The real estate, the fee to which was thus retained by the partnership, was leased to petitioner and used by it in its business. Under this lease, petitioner had the right to possess, occupy, and use such real estate for a period of 55 years, or for a longer period than the useful physical and economic life thereof. Leaseholds for such an extended period of time have been administratively classified in Regulations 111, section 29.112 (b) (1)–1, and the predecessors thereof, as property of a like kind with and the equivalent of a fee in real estate within the purview of the taxing statute. See *Century Electric Co.*, 15 T. C. 581; cf. also *Standard Envelope Mfg. Co.*, 15 T. C. 41. The validity of the cited regulation is no longer open to question. *Century Electric Co.*, *supra;* see also *Commissioner v. Crichton*, 122 F. 2d 181, affirming 42 B. T. A. 490. Thus, it appears that petitioner acquired a leasehold interest in the property, the bare fee of which was retained, and, which, if not the equivalent of a fee, constituted substantially all of the partnership's interest therein.

It is the position of the respondent, however, that the leasehold estate was acquired by petitioner, not for stock, but for a separate continuing obligation to pay a substantial rent as long as petitioner occupied and used the premises. True, the lease as executed recites as consideration therefor the payment of rent and all other expenses with respect to the property. But, from the evidence it seems clear that the leasehold estate, which, as we have pointed out, was sub-

stantially equal to the fee, was obtained by petitioner in exchange for its stock. The consideration recited in the actual lease instrument was the right to retain the leasehold estate thus obtained. A similar principle applies when leasehold estates are sold, as they often are. In such cases, the consideration involved is other than the rent, etc., stipulated in the instrument of lease. With respect to the question involving the transfer of the partnership's good will, respondent, while conceding on brief that petitioner acquired all of such good will in some manner, not only disputes the propriety of the value assigned thereto by petitioner, but also argues that the transfer of the entire amount thereof was not made solely in exchange for stock.

The evidence of record bearing upon the value of the good will of the partnership shows that the partnership was at all times a going and prosperous concern from and after its formation in 1932. It never sustained an operating loss and always made substantial profits. Moreover, the business carried on by the partnership appears to have been generally stable in that the wares sold by it were not subject to violent price fluctuations. In short, all the facts here give the partnership a financial history of a going, prosperous concern with the number of customers and its business generally increasing. These facts, based upon the undisputed evidence before us, all have a direct bearing upon the value of the partnership's good will. There are many methods of determining such value. One method is by applying the venerable formula set out in A. R. M. 34, 2 C. B. 31. The value of $310,488.13 assigned to the intangible asset of the partnership as of the time of its transfer, and here advocated by petitioner, was so determined. Respondent urges that expert testimony as to what a willing buyer would pay for the business as a going concern is the best evidence of the value of the good will thereof, and that no such testimony has been here presented. The absence of such testimony is not fatal, however. Absent an actual arm's-length sale as a comparative, the testimony of an expert witness is little, if anything, more than an opinion formed after consideration of the same financial history which we have before us. Moreover, the book value of many of the partnership's assets used in petitioner's determination may have, in some situations, probative weight comparable with opinion evidence in respect to value. We do not believe we are required to fix a precise value of the partnership's good will on the date it was transferred to petitioner. Suffice it to say, it was very considerable and added to the value of the transferred assets in a substantial amount.

On the record here made we have come to the ultimate conclusion and found as a fact that petitioner acquired substantially all of the partnership's properties in 1940 solely in exchange for stock. Moreover, immediately after the exchange the partners were in control of

petitioner and the stock received by each was substantially in proportion to his interest in the partnership properties prior to the exchange. This being true, the transaction was an exchange to which section 112 .(b) (5) is applicable. It follows, and we therefore hold, that petitioner is an "acquiring corporation" within the meaning of section 740 (a) (1) (D); the partnership is a component corporation within the provisions of section 740 (b) (5) and petitioner is entitled to an excess profits credit for the years involved based upon the average base period net income of such component corporation adjusted as required by section 742 (g) of the Code.[4] See also *Faigle Tool & Die Corporation*, 7 T. C. 236.

The computations of the various adjustments thus required are made just as if the partnership had been a corporation during the base period years. Section 742 (g), *supra*. The parties are in agreement as to the adjustment to be made with regard to the Ohio State franchise tax and the Federal capital stock tax, and the respective amounts thereof.

Among adjustments as to which the parties are in disagreement are the officers' salaries; the adjustment, if any, to be made with regard to a certain bad debt expense deduction allowed petitioner's predecessor partnership for the year 1937; and the adjustment, if any, to be made in connection with deductions allowed the partnership during the base period years 1936 to 1939, inclusive, for Federal and State of Ohio unemployment insurance taxes.

The computation of the base period net income of the partnership, which, for our purposes, is a component corporation of petitioner, must reflect a reasonable deduction for salary or compensation to each partner. See Regulations 112, section 35.742-1 (b) (2),[5] the

---

[4] SEC. 742. SUPPLEMENT A AVERAGE BASE PERIOD NET INCOME.

In the case of a taxpayer which is an acquiring corporation, its average base period net income (for the purpose of the credit computed under section 713) shall be the amount computed under section 713 or the amount of its Supplement A average base period net income, whichever is the greater. The Supplement A average base period net income shall be the amount computed without regard to subsection (h) of this section or computed under subsection (h) of this section, whichever is the greater. The Supplement A average base period net income shall be computed as follows:

\* \* \* \* \* \* \*

(g) In the case of a partnership which is a component corporation by virtue of section 740 (b) (5), the computations required by this Supplement shall be made, under rules and regulations prescribed by the Commissioner with the approval of the Secretary, as if such partnership had been a corporation. For the purpose of such computations, in making the adjustment for income taxes required by section 711 (b) (1) (A), the partnership so regarded as a corporation shall be considered as having distributed all its net income as a dividend.

[5] SEC. 35.742-1. GENERAL RULES FOR DETERMINING SUPPLEMENT A AVERAGE BASE PERIOD NET INCOME.—\* \* \*

(b) *General average method.*—\* \* \*

(2) *Determination of excess profits net income or deficit in excess profits net income of acquiring corporation and each component corporation.*—\* \* \*

In the case of a component corporation which is a partnership \* \* \* its excess profits net income or deficit in excess profits net income for each taxable year in the base period shall be determined as though such partnership \* \* \* had been a corporation for each

pertinent portion of which appears in the margin. The question of what would have constituted reasonable salaries for officers during the base period had the partnership been a corporation is one of fact and the burden of establishing such reasonableness is upon the taxpayer.

To this end, petitioner has produced evidence that the partners were paid in each base period year, before any division of profits, amounts which were designated as salaries on the partnership books and which, in the aggregate, ranged from approximately $5,600 to approximately $6,500 per year. It is petitioner's contention that this evidence of what was actually paid the partners in the base period years constitutes the best evidence of the "reasonable deduction" for salaries, and that such payments should be used in computing the base period net income of the partnership under section 742, *supra*. The situation here is just the converse of that usually made in determining salaries. Here it is to petitioner's advantage to establish the reasonableness of small salaries, while respondent argues for high salaries. But the tests of reasonableness are still the same as in income deduction cases.

The record is devoid of any evidence bearing upon a number of important factors usually considered essential in determining the reasonableness of salaries. Moreover, petitioner's contention as to the weight to be given to the salaries actually paid by the partnership is deprived of much of its probative force by the fact that, when, again as its own assessor, it prepared and filed its initial excess profits tax return for 1942 and again for 1943, it considered $35,833, the figure here advocated by respondent, as a reasonable allowance for officers' salaries in adjusting the base period net income of the partnership for the purposes of computing its excess profits credit based thereon. *D. & N. Auto Parts Co.*, 8 T. C. 1192.

We are of the opinion that, on this point, petitioner has failed to prove its case. That being true, we have no alternative to sustaining the respondent.

We turn now to the question of whether any part of the bad debts deductions, allowed the partnership for 1937, may be disallowed for the purposes of computing excess profits credit based on income. The pertinent provisions of the Code are section 711 (b) (1) (J) and (K).[6]

such year. Among the adjustments which are necessary in computing the excess profits net income or deficit in excess profits net income are the following:

(i) A reasonable deduction for salary or compensation to each partner * * * for personal services actually rendered shall be allowed;

[6] SEC. 711. EXCESS PROFITS NET INCOME.

(b) TAXABLE YEARS IN BASE PERIOD.—

(1) GENERAL RULE AND ADJUSTMENTS.—The excess profits net income for any taxable year subject to the Revenue Act of 1936 shall be the normal-tax net income, as defined in section 13 (a) of such Act; and for any other taxable year beginning after December 31, 1937, and before January 1, 1940, shall be the special-class net income, as defined

In 1937, the partnership changed from the charge-off method of deducting bad debts, which method it had regularly followed from the time of its organization, to the reserve method of deducting bad debts. This change was effected as of December 31, 1937, pursuant to permission earlier obtained from respondent. In making the change, a reserve for bad debts was set up on the partnership's books in the amount of $96,234.96. The debts previously determined to be bad and charged off during that year, in the aggregate amount of $40,-610.68, were debited thereto. The balance of $55,624.28 thus remaining in the reserve represented 20 per cent of the accounts receivable outstanding at December 31, 1937. The partnership's right to deduct the entire amount of the reserve in its returns for 1937 was sustained in *Bennie Rudner*, 47 B. T. A. 35, wherein it was said that:

There can be no question that $96,234.96, the amount of the deduction claimed, covers the bad debt requirements of the partnership for a two-year period and that deduction of the full amount in 1937 results in the distortion of net income for that year. It is the logical result, however, of the change from the specific charge-off method to the reserve method of accounting for bad debts and is in keeping with the decisions * * *.

Petitioner argues that the findings of fact, opinion, and the decisions cited in the foregoing case make both the question of abnormality of the deduction, as well as the cause of such abnormality, res judicata here. We do not feel that a definite ruling by us on that question is necessary to a proper disposition of the question before us. While we

---

in section 14 (a) of the applicable revenue law. In either case the following adjustments shall be made (for additional adjustments in case of certain reorganizations, see section 742, (e) :

\*       \*       \*       \*       \*       \*       \*

(J) Abnormal Deductions.—Under regulations prescribed by the Commissioner, with the approval of the Secretary, for the determination, for the purposes of this subparagraph, of the classification of deductions—

(i) Deductions of any class shall not be allowed if deductions of such class were abnormal for the taxpayer, and

(ii) If the class of deductions was normal for the taxpayer, but the deductions of such class were in excess of 125 per centum of the average amount of deductions of such class for the four previous taxable years, they shall be disallowed in the amount equal to such excess.

(K) Rules for Application of Subparagraphs (H), (I), and (J).—For the purposes of subparagraphs (H), (I), and (J)—

(i) If the taxpayer was not in existence for four previous taxable years, then such average amount specified in such subparagraphs shall be determined for the previous taxable years it was in existence and the succeeding taxable years which begin before the beginning of the taxpayer's second taxable year under this subchapter. If the number of such succeeding years is greater than the number necessary to obtain an aggregate of four taxable years there shall be omitted so many of such succeeding years, beginning with the last, as are necessary to reduce the aggregate to four.

(ii) Deductions shall not be disallowed under such subparagraphs unless the taxpayer establishes that the abnormality or excess is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

(iii) The amount of deductions of any class to be disallowed under such subparagraphs with respect to any taxable year shall not exceed the amount by which the deductions of such class for such taxable year exceed the deductions of such class for the taxable year for which the tax under this subchapter is being computed.

do not agree with petitioner's contention that the evidence shows the deduction to have been abnormal as to class, the evidence adduced does clearly show that the deduction in controversy was abnormal in amount, in that it was in excess of 125 per centum of the average of the bad debts deductions for the preceding 4 taxable years by the amount of $77,097.41. Moreover, petitioner has also affirmatively proven that such abnormality was a consequence of something other than those factors proscribed by section 711 (b) (1) (K) (ii). *William Leveen Corporation*, 3 T. C. 593.

Respondent draws no support from *Crow-Burlingame Co.*, 15 T. C. 738, which he cites, inasmuch as we are unable to subscribe to his contention that the partnership's change in the accounting procedure by which it deducted bad debts comes within the proscription of the pertinent statute as constituting a change in the manner of operation of its business.

Accordingly, we hold that the abnormal deduction for bad debts allowed the partnership in 1937 should be disallowed in computing petitioner's excess profits credit based on income to the extent of the amount by which such deduction was in excess of 125 per centum of the average amount of bad debts deductions for the four previous taxable years as further limited by section 711 (b) (1) (K) (iii).

There remains the question of whether any part of the deductions for Federal and State of Ohio unemployment taxes allowed the partnership during the years 1936 through 1939 should be disallowed in the computation of petitioner's excess profits credit based on income pursuant to section 711 (b) (1) (J) and (K), the pertinent portions of which are set forth *supra* in footnote 6.

During the base period years, petitioner's predecessor and component corporation, the partnership, paid Federal and State of Ohio unemployment insurance taxes at various rates and in varying amounts. Such rates and the amounts so paid are set forth above in our Findings of Fact.

Petitioner contends that the deductions for such taxes paid were abnormal in amount. It has, on brief, computed, in accordance with the limitations contained in section 711 (b) (1) (J) (ii) and K (iii), *supra*, the amounts of the abnormalities which it maintains should be disallowed in determining its excess profits credit for each of the years here under review. We have checked the petitioner's mathematical computations and are satisfied as to their accuracy and as to the propriety of the method employed therein. See *Harris Hardwood Co.*, 8 T. C. 874. But, as pointed out in the *Harris* case, such amounts are to be eliminated from the partnership's deductions for the base period years in computing petitioner's excess profits credit for the excess profits tax years involved only if petitioner has established that the

abnormalities or excesses are not the consequences of any of the proscriptions contained in section 711 (b) (1) (K) (ii). This, in our opinion, petitioner has failed to do.

During the base period years and up until about January 1, 1942, the business carried on first by the partnership and later by petitioner included a used furniture department. As of January 1, 1942, petitioner divested itself of this department, and, for aught the record shows, some part of the amount by which the deductions for unemployment tax in the base period years was in excess of such deductions for the excess profits tax years involved may have been due to this change in the size of petitioner's business. At least petitioner has failed to prove otherwise. Therefore, no part of the deductions in question may be disallowed. See *Iron Fireman Manufacturing Co.,* 5 T. C. 452.

All stipulations and concessions of the parties will be reflected in the Rule 50 recomputation consequent hereon. Proper effect will be accorded any unused excess profits credit to which recomputation shows petitioner to be entitled.

*Decision will be entered under Rule 50.*